COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Willis and Senior Judge Hodges
Argued at Richmond, Virginia


MARVIN GEORGE MAY
                                    MEMORANDUM OPINION* BY
v.    Record No. 0140-01-2          JUDGE WILLIAM H. HODGES
                                         JULY 23, 2002
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                    Thomas N. Nance, Judge

            John B. Boatwright, III (Boatwright & Linka,
            on briefs), for appellant.

            Robert H. Anderson, III, Senior Assistant
            Attorney General (Randolph A. Beales,
            Attorney General, on brief), for appellee.


     Marvin George May, appellant, appeals two aggravated

malicious wounding convictions, one malicious wounding conviction,

and three convictions for use of a firearm in the commission of

those felonies.  Appellant presents three issues on appeal:  (1)

whether the trial court erred by refusing to instruct the jury on

the lesser-included offense of unlawful wounding with regard to

the two aggravated malicious wounding offenses;[1] (2) whether the

trial court erred by failing to inform the jury that any sentence

---

     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

     [1] The trial court gave an instruction with the
lesser-included offense of unlawful wounding for the malicious
wounding count.

the jury imposed was presumed to run consecutively; and (3) whether the trial court erred by denying his motion for a new trial based on after-discovered evidence and perjured testimony of a Commonwealth's witness. Finding the trial court committed no error, we affirm the judgment of conviction.

<u>BACKGROUND</u>

In the early morning hours of April 16, 2000, a close friend of appellant's, Luther Tyler, was shot and later died. Appellant was grieving the loss of his friend and was angry. Appellant called another friend, Lamonte Pollard. Pollard understood that some people from the Highland Park area of Richmond were responsible for Tyler's death. Appellant asked Pollard to accompany him to shoot up that neighborhood. Pollard declined to join appellant.

Later the same day, appellant arrived at a car rental business with Dwayne Hill and Walter Green. The three rented a white Thunderbird, under appellant's name. As they were leaving, appellant said, "Let's go. Let's go do it." Appellant was seen that day riding in the Thunderbird.

That afternoon, fourteen-year-old Antonio Young left a store in Highland Park. He heard gunshots and began to run. He attempted to go over some bushes but a bullet struck him in the back. Young suffered permanent paralysis as a result of the gunshot wound. Young did not know Tyler or anything about Tyler's murder.

- 2 -

Twenty-one-year-old Dante Wallace was leaving the same store when he heard gunshots.  A bullet struck Wallace in the back, and he too suffered permanent paralysis.  Wallace identified the white Thunderbird as the car with the shooters, but could not identify who shot him.  Latoya Cherry was with Wallace.  She heard the gunshots, saw more than one shooter in the white Thunderbird and identified Hill from a photographic lineup as one of the shooters.  Like Young, Wallace had no connection to Tyler or Tyler's murder.

Stanley Davis was parked on the street when he heard gunshots.  Bullets hit his windshield, and he attempted to exit the car.  He then heard a shotgun, and he was hit twice in the leg.  Davis identified appellant as one of the shooters, though he could not identify who shot him.

Richmond Police Detective Ray Williams testified he recovered several 9mm empty shell casings and five 12-gauge shotgun shells from the street and sidewalk in the surrounding area.  Williams later recovered a Tech 9 semi-automatic firearm and a Remington 12-gauge pump shotgun.  John Wilmer, a firearms expert, testified the spent shells and casings had been fired from those weapons.  Donald Nutall testified Hill and two other men, one of whom Nutall was "relatively sure" was appellant, asked him to help clean and strip several weapons.  Among those weapons were the Tech 9 and the shotgun.

Several witnesses testified to various statements appellant made concerning the shootings.  Appellant accused a friend of

Tyler's named Alvin of being a "fake thug" and "paper thug" because Alvin would not do anything to avenge Tyler's murder. Tonelle Hicks expressed her disapproval for the Highland Park shootings, to which appellant responded that it didn't matter if a three-year-old child had been shot, "their family needed to feel like his family felt." Appellant also got upset when he learned that Green was bragging about the incident and made a telephone call telling Green he was going to get them all "locked up." Pollard testified appellant admitted he shot a young kid who was trying to go over a fence.

At trial, appellant denied any involvement with the shootings and presented evidence of an alibi. Several witnesses testified to appellant's whereabouts throughout the majority of the day. Appellant's mother asked appellant about a dirty shirt he was wearing, and appellant indicated it was dirty from wiping tears from his face.

In rebuttal, the Commonwealth recalled Detective Williams, who testified, based on his thirty years of experience as a police officer, that whenever someone fires a weapon, a residue of black soot gets on his or her hands, regardless of the type of weapon involved. The more the weapon is fired, the more black soot will be left behind.

During deliberations on sentencing, the jury asked whether any sentences given to appellant would run concurrently or consecutively. The trial court answered that the jury was to fix

- 4 -

punishment as to each charge as it felt just under the circumstances and that it was not to concern itself with what happens to the sentences later.

Appellant filed a motion for a new trial based on after-discovered evidence and perjured testimony at trial. The trial court held a hearing on the motion after trial and before sentencing. At the hearing, Cleon Mauer and Wilmer testified that Williams' testimony was incorrect in that a visible residue from firing a weapon does not come back onto the shooter's firing hand and clothing. However, the experts both testified that residue does remain on the muzzle, and Wilmer confirmed that at least one type of residue would be gray or black in color and visible when transferred to a fiber or fabric.

Attorney Lee Kilduff also testified at the motion hearing. She stated she spoke to Davis during an unrelated criminal proceeding in which Davis was a victim testifying against her client. Kilduff asked Davis what had occurred at appellant's preliminary hearing. Davis responded he did not testify at the preliminary hearing because he did not see anything due to his back being turned. Davis testified at the motion hearing and explained he meant that he did not see who shot him because his back was turned when he got shot.

Harvey Churchwell testified in a separate trial against appellant's codefendant, Green. At Green's trial, Churchwell recounted that appellant drove Hill and Churchwell to Highland

Park.  Churchwell saw Hill shooting but did not see appellant firing because Churchwell crouched down in the car.  Churchwell's account of the events differed in detail from Davis' testimony at appellant's trial.

Finally, Hicks wrote a letter to appellant in which she indicated she had to testify against appellant because of recorded conversations between herself and appellant and the authorities' knowledge that she had information about the shootings.  She wrote that she feared being prosecuted if she withheld information or perjured herself at trial.  Her letter did not state she testified falsely, and she testified at the hearing that she testified truthfully at the trial and no one influenced her testimony.

ANALYSIS

Unlawful Wounding Instruction

There are "well-established legal principles that jury instructions are proper only if supported by the evidence, and that more than a scintilla of evidence is necessary to support a lesser-included offense instruction requested by the defendant." Commonwealth v. Donkor, 256 Va. 443, 445, 507 S.E.2d 75, 76 (1998).  Appellant sought an instruction on unlawful wounding based on the possibility that the jury could reject the presumption of malice from the use of a deadly weapon.  To support a finding of unlawful wounding, the jury would have to conclude that appellant acted in the heat of passion or in the absence of malice.

> Malice inheres in the intentional doing of a wrongful act without legal justification or excuse. Malice is not confined to ill will, but includes any action flowing from a wicked or corrupt motive, done with an evil mind or wrongful intention, where the act has been attended with such circumstances as to carry in it the plain indication of a heart deliberately bent on mischief.

Williams v. Commonwealth, 13 Va. App. 393, 398, 412 S.E.2d 202, 205 (1991). "'Malice and heat of passion are mutually exclusive; malice excludes passion, and passion presupposes the absence of malice.' . . . 'Heat of passion is determined by the nature and degree of the provocation and may be founded upon rage, fear, or a combination of both.'" Canipe v. Commonwealth, 25 Va. App. 629, 643, 491 S.E.2d 747, 753 (1997) (citations omitted).

Appellant presented an alibi defense. Thus, his theory of the case did not support the lesser-included offense instruction of unlawful wounding. Further, the Commonwealth's evidence proved that appellant planned and enlisted the assistance of others to go into the Highland Park neighborhood to shoot innocent people to avenge the death of his friend Tyler. No evidence suggested Young or Wallace had any connection to appellant, Tyler or Tyler's murder. No evidence suggested Wallace or Young provoked the attack in any way. The Commonwealth's evidence negated any notion that appellant acted in the heat of passion or without malice. Therefore, there was

- 7 -

not even a scintilla of evidence to support the unlawful

wounding instruction.

Further, that the jury could reject evidence does not

qualify as evidentiary support for a defendant's lesser-included

offense instruction.  Donkor, 256 Va. at 446-47, 507 S.E.2d at

76 (citing LeVasseur v. Commonwealth, 225 Va. 564, 304 S.E.2d

644 (1983)).  The court must look to the evidence in the case to

find support for the offered instruction.  Accordingly, the

trial court did not err by refusing to instruct the jury on

unlawful wounding as a lesser-included offense of aggravated

malicious wounding.

### Jury Question on Consecutive/Concurrent Sentences

"The choice of sentencing procedures is a matter for

legislative determination."  Duncan v. Commonwealth, 2 Va. App.

342, 344, 343 S.E.2d 392, 393 (1986) (citation omitted).  In a

jury trial, the jury ascertains "within the limits prescribed by

law, the term of confinement in the penitentiary or in jail and

the amount of fine . . . ."  Code § 19.2-295.

> "[T]he punishment fixed by the jury is not
> final or absolute, since its finding on the
> proper punishment is subject to suspension
> by the trial judge, in whole or in part, on
> the basis of any mitigating facts that the
> convicted defendant can marshal.  The
> verdict of the jury is the fixing of maximum
> punishment which may be served.  Under such
> practice, the convicted defendant is
> entitled to 'two decisions' on the sentence,
> one by the jury and the other by the trial
> judge in the exercise of his statutory right
> to suspend . . . .  This procedure makes the

- 8 -

> jury's finding little more than an advisory
> opinion or first-step decision."

Duncan, 2 Va. App. at 345, 343 S.E.2d at 394 (quoting Vines v. Muncy, 553 F.2d 342, 349 (4th Cir. 1977)).  After the jury fixes the maximum sentence, the legislature provides the trial judge with the discretionary authority to suspend or modify that sentence.  See id.  "When any person is convicted of two or more offenses, and sentenced to confinement, such sentences shall not run concurrently, unless expressly ordered by the court."  Code § 19.2-308.  The trial court exercises this authority at its discretion.  Moore v. Commonwealth, 27 Va. App. 192, 200, 497 S.E.2d 908, 911 (1998).

When the jury asked whether the sentences it fixed would run concurrently or consecutively, the jury had no evidence before it as to how or whether the trial judge would modify the sentences.  Further, the jury had not yet communicated to the trial judge what sentences it intended to impose.  Therefore, it is reasonable to conclude that the trial judge did not know whether he would modify the recommended sentences by running the sentences concurrently or otherwise suspending the sentences. To advise the jury that the court had the discretion to modify the sentences would cause the jury to speculate as to what action the trial court might take.  Such speculation would deprive appellant and the Commonwealth of a fair trial.  See

- 9 -

Fishback v. Commonwealth, 260 Va. 104, 113, 532 S.E.2d 629, 633 (2000).

In Fishback, the Virginia Supreme Court discussed the underlying principles that previously guided trial courts not to instruct a non-capital jury about parole eligibility. The Court noted that

> "the assessment of punishment is a function of the judicial branch of government, while the administration of such punishment is a responsibility of the executive department. The aim of the rule in Virginia is to preserve, as effectively as possible, the separation of those functions during the process when the jury is fixing the penalty, in full recognition of the fact that the average juror is aware that some type of further consideration will usually be given to the sentence imposed."

Id. at 112, 532 S.E.2d at 632 (citation omitted). The Court determined that, because parole had been abolished and geriatric release was determined upon a mathematical calculation, and thus the jury could determine a sentence without speculation, a defendant is entitled to an instruction on those specific matters affecting early release. However, "'at the time a jury assesses punishment it does not, and cannot, have a factual basis upon which to factor the provisions for good behavior credit into its determination of an appropriate sentence in a given case. Rather, such an effort would be an exercise in pure speculation." Id. at 116, 532 S.E.2d at 634. Therefore, the Court directed that the jury should not be instructed on the

possibility of early release based on earned good behavior

credits.  Id.

Appellant's case does not involve the different roles of

the judicial and executive branches with regard to sentencing.

However, the same principles apply.  To instruct the jury that

the trial judge could run the sentences concurrently would cause

the jury to speculate what action the trial judge would take.

With no evidence as to what action the trial judge would take in

modifying the jury's sentences, to instruct on the possibility

of running the sentences concurrently would taint the jury

process of fixing punishment.  Therefore, the trial court did

not err by refusing to instruct the jury on Code § 19.2-308 and

the trial court's ability to modify the jury's sentences.

### Motion for new trial

> "Motions for new trials based on
> after-discovered evidence are addressed to
> the sound discretion of the trial judge, are
> not looked upon with favor, are considered
> with special care and caution, and are
> awarded with great reluctance . . . .  The
> applicant bears the burden to establish that
> the evidence (1) appears to have been
> discovered subsequent to trial; (2) could
> not have been secured for use at the trial
> in the exercise of reasonable diligence by
> the movant; (3) is not merely cumulative,
> corroborative or collateral; and (4) is
> material, and such as should produce
> opposite results on the merits at another
> trial."

Hopkins v. Commonwealth, 20 Va. App. 242, 249, 456 S.E.2d 147,

150 (1995) (en banc) (citation omitted).

- 11 -

Appellant first contends the trial court erred by failing to grant a new trial based on Williams' alleged perjured testimony concerning gunshot residue. Mauer and Wilmer did not testify that Williams lied, but that he was incorrect. Both experts indicated that a dark residue does not come back on the hands of the person firing the weapon. They indicated that gunshot residue shoots out the barrel in the same direction as the bullet. However, Wilmer testified that a dark residue would be left on the weapon that could be transferred from the muzzle to a tissue and presumably an article of clothing. Thus, the record does not support the conclusion that Williams offered perjured testimony.

Additionally, appellant's shirt was not analyzed for any gunshot residue and no evidence indicated that residue was on appellant's shirt. Appellant's mother testified she saw appellant's shirt was dirty before the shootings took place. Further, appellant failed to attempt to rebut Williams' testimony though Wilmer was still available to testify after Williams testified. Therefore, appellant did not exercise due diligence in presenting the evidence and the record does not show that the evidence was material such that it would affect the outcome of the trial.

Next, appellant maintains he was entitled to a new trial based on attorney Kilduff's testimony about Davis' statement to her. However, there was no inconsistency in Davis' statement to

Kilduff and his testimony at trial. Davis testified at trial that while he saw appellant with a firearm at the scene, his back was turned when he was shot and so he did not know who shot him. At the hearing, Davis explained that his statement to Kilduff merely referred to the fact that he did not testify at the preliminary hearing because he did not see who shot him. Kilduff's testimony, therefore, would not have changed the outcome of appellant's case and, as such, was not material.

Appellant also argues he was entitled to a new trial based on Churchwell's testimony at Green's trial. Churchwell testified at Green's trial that he rode to the crime scene with appellant and Hill. Churchwell stated he initially saw Hill firing a shotgun but Churchwell did not continue to watch the events because he ducked down in the car. According to the transcript excerpt, Churchwell did not see appellant exit the car or fire a weapon. Nevertheless, Churchwell's testimony placed appellant at the scene of the crime and implicated appellant as an active participant in the offenses. Though Churchwell's testimony varied from Davis' in the details of how the events unfolded, nothing in Churchwell's testimony suggested the new evidence would have impeached Davis or affected the outcome of the trial. Further, appellant was in the car with Churchwell and, thus, appellant knew Churchwell was a potential witness. Therefore, appellant could have secured Churchwell's presence at trial with the exercise of due diligence and the

- 13 -

testimony was not material such that it would have altered the outcome of the trial.

Finally, appellant argues he should have been granted a new trial based on Hicks' letter. In the letter, Hicks claimed she testified against appellant because the prosecution was aware she had information about the case and she feared being prosecuted herself. Nothing in the letter, or her testimony at the hearing, indicates she testified falsely at trial or that she was unduly pressured to testify falsely. The content of her letter was collateral and not likely to produce a different result at trial. Therefore, the trial court did not err by denying appellant's motion for a new trial based on any of the grounds stated in support of the motion.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

Benton, J., concurring.

I substantially concur in the opinion and in the judgment affirming the convictions. I write separately because I disagree with several of the majority's conclusions.

I.

During the penalty phase of the trial, the jury asked "[t]he question . . . would sentences be served concurrent." Over the objection of May's defense attorney, the trial judge responded as follows:

> Very intelligent question. However, my instruction to you is that on each of these charges within the limits given to you by the Court, you are to set a sentence that you feel is just under the circumstances. You're not to concern yourselves with what might happen later.

I believe May correctly contends that the judge's response was unsuited to the inquiry.

"The General Assembly, in carrying out its appropriate legislative function, has established a system for the ascertainment of punishment for those who have been convicted of crimes." Duncan v. Commonwealth, 2 Va. App. 342, 344, 343 S.E.2d 392, 393 (1989).

> Within the limits prescribed by law, the term of confinement in the state correctional facility or in jail and the amount of fine, if any, of a person convicted of a criminal offense, shall be ascertained by the jury, or by the court in cases tried without a jury.

Code § 19.2-295. Thus, by this statute, "when the court sits without a jury, the trial judge tries the issue of guilt and fixes the penalty; when the accused demands a jury, the jury performs both functions." Huggins v. Commonwealth, 213 Va. 327, 328, 191 S.E.2d 734, 736 (1972).

The Supreme Court has "acknowledge[d] that . . . 'truth in sentencing' is a goal to be desired in the judicial process." Fishback v. Commonwealth, 260 Va. 104, 113, 532 S.E.2d 629, 632 (2000). To achieve this goal, judges must be attentive to the jury's inquiries concerning its punishment function.

> [T]o perform its responsibility a jury is required to consider a broad range of punishment in terms of years of confinement statutorily established by the legislature. . . . [W]ithin the permissible range of punishment a jury is required to determine a specific term of confinement that it considers to be an appropriate punishment under all the circumstances revealed by the evidence in the case. A jury should not be required to perform this critical and difficult responsibility without the benefit of all significant and appropriate information that would avoid the necessity that it speculate or act upon misconceptions concerning the effect of its decision. Surely a properly informed jury ensures a fair trial both to the defendant and the Commonwealth.
>
> The question then becomes how a jury is to be instructed so that it is properly informed and can render a fair trial to both parties . . . .

Id.

This jury's inquiry clearly indicated the jury understood that sentences may be concurrent and obviously was considering how to factor that circumstance in weighing the punishment to be ascertained. The answer to the jury's inquiry is found in the provisions of Code § 19.2-308 ("[w]hen any person is convicted of two or more offenses, and sentenced to confinement, such sentences shall not run concurrently, unless expressly ordered by the court") and Code § 19.2-303 ("After conviction . . . with . . . jury, the court may suspend imposition of sentence or suspend the sentence in whole or part."). A brief response grounded in those statutes would have been sufficient to explain the applicable law and to fully address the inquiry.

"It is axiomatic that '[i]t belongs to the [trial] court to instruct the jury as to the law, whenever they require instruction, or either of the parties request it to be given.'" Fishback, 260 Va. at 117, 532 S.E.2d at 635. Here, however, the trial judge left the jury to speculate as the jury sought to weigh the broad range of punishment available to it. A brief, accurate response about the statutes would have addressed the jury's concern and negated any "speculation by the jury [, which the Supreme Court has deemed] inconsistent with a fair trial both to the defendant and the Commonwealth." Id.

The record reflects, however, that the error was harmless. "Under the harmless error doctrine, the judgment of the court below will be affirmed whenever we can say that the error

- 17 -

complained of could not have affected the result." Rhoades v. Painter, 234 Va. 20, 24, 360 S.E.2d 174, 176 (1987). The jury returned verdicts ascertaining May's punishment to be the maximum sentence on each offense, including two life sentences. The verdicts reflect that the jury intended to eliminate the possibility that May would be released from prison. I cannot say that if the trial judge had given a response concerning the applicable law, the jury would have reached a different verdict. Furthermore, the trial judge had the discretion to suspend any portions of the sentences and did not do so.

## II.

Although I agree that the trial judge did not err in refusing the motion for a new trial, I discern no basis to conclude that the motion was deficient because of a lack of due diligence by May's attorney. The record reflects that the trial judge did not find that May's attorney was not diligent. Indeed, his findings included the following:

> This case was fairly tried. I think you did a good job in it. You were prepared and the Commonwealth was also. It was fairly heard by a jury and they made their decision.

Denying the motion for a new trial, the judge found that the evidence "would not have made any difference" in the outcome of the trial.

In order to prevail on a motion for a new trial based on after-discovered evidence, the moving party must establish

several necessary conditions, including "that [the after-discovered evidence] is material, and such as would produce opposite results at trial." Payne v. Commonwealth, 233 Va. 460, 472, 357 S.E.2d 500, 507 (1987). Of greatest concern is the testimony of both forensic firearms examiners that the police officer gave incorrect testimony on rebuttal about the amount and visibility of residue that deposits on a person who fires an automatic gun. I believe the trial judge correctly found, however, that given the quantity and quality of the other evidence, the fact finder's weighing of the after-discovered evidence, as disclosed by the forensic experts, would not have produced an opposite result at another trial.

For these reasons, I concur in affirming the convictions.